# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RUKIYA BATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-01414** |
| | ) | **Judge Aleta A. Trauger** |
| **LEVITON MANUFACTURING CO., INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff Rukiya Bates filed this lawsuit against her former employer, Leviton Manufacturing Co. ("Leviton"), asserting claims of race discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. (*See* Compl., Doc. No. 1.) Now before the court is Leviton's Motion for Summary Judgment (Doc. No. 30) which, for the reasons set forth herein, will be granted in part and denied in part.

## I.  LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

II.     FACTS

Bates is an African American woman. (Compl. ¶ 6.) Leviton hired Bates as a "Warehouse I" worker in January 2023.[1] At all times during Bates' employment, her direct supervisor was

---

[1] The factual statements for which no citation is provided are drawn directly from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("RSUMF") (Doc.

Dianna "Gail" Montgomery. Montgomery is Caucasian. (Compl. ¶ 11.) The plaintiff recalled during her deposition that, whenever she went to Montgomery with questions during the first weeks of her employment, she perceived Montgomery to treat her as if she were asking "dumb" questions and "wasting her time," and Montgomery would either "respond[] very vaguely" to her questions or simply walk away. (Doc. No. 32-2, Bates Dep. Vol. 1 at 77–78.)[2]

The plaintiff was told during her orientation that Human Resources Manager Sheila McClain had an "open-door policy" and was always available for employees to go talk to her. (*Id.* at 48.) Around the first week of February, and shortly after her first unsatisfactory encounters with Montgomery, Bates availed herself of that policy, reporting to McClain that she could "never get a definite answer out of" Mongomery, that Montgomery "dismissed [her] every time," and that she had "heard [Montgomery] say things about other employees." (*Id.* at 80; *see also id.* at 81 ("I began to tell her [McClain] that I felt like Gail Montgomery was mistreating me as a – just a human being. . . . I said, She says things under her breath. She never gives a direct answer when it comes to instructions. She's also dismissive and passive of me and things to that nature.").)[3] McClain encouraged Bates to "give it more time" and assured her that she was "doing a good job." (*Id.* at 82.)

---

No. 35-1) and undisputed or undisputed for purposes of the defendant's Motion for Summary Judgment. All facts are viewed in the light most favorable to the plaintiff unless otherwise indicated, but the court disregards the plaintiff's commentary in her RSUMF that is unrelated to the stated fact or irrelevant.

[2] The two volumes of the plaintiff's complete deposition transcript are in the record at Doc. Nos. 32-2 (pages 1–221) and 32-3 (pages 222–383. The court refers to the transcript herein by its original pagination rather than by referencing the CM/ECF document and page number.

[3] According to Montgomery, she "didn't have any issues" with Bates, except that she "didn't take criticism too well." (Doc. No. 32-7, Montgomery Dep. 24.)

Around February 10, 2023, the plaintiff met with Montgomery for her first performance review. According to Bates, when she got to Montgomery's desk, Montgomery did not look up but just told her, "Okay, you got 85 percent, 83, 85 here. Okay. That's good . . . . Can you sign this? It's your evaluation." (*Id.* at 84–85.) The plaintiff "went to sign" the form but, when she moved the papers to the side, she saw more papers with her name on them underneath. (*Id.* at 85.) She asked what they were and tried to look at them, but Montgomery told her that she needed to go over them with McClain first. Bates insisted that they go talk with McClain immediately. (*Id.*)

When they got to McClain's office, Bates immediately told her that Montgomery "is writing all these lies about me." (*Id.* at 85.) Bates believed she had seen something on the documents about attendance, but she denied having any attendance issues. Bates did not disagree with the "production" part of the review, apparently meaning her productivity scores (*see id.* at 86 ("Yeah. The production part is right.")), but she denied having a "bad attitude" (*id.*).

Regarding "attitude," the "Monthly Report" form for February 10, 2023 stated: "No attendance issues. Rukiya takes offense when trying to train her on picking rules. I have had some complaints about her attitude. I hope we have worked this out." (Doc. No. 32-5.) The form includes a handwritten notation, signed by Sheila McClain, that states: "Gail & I met with Rue and explained the process. She refused to sign." (*Id.*) Bates testified that, by complaining to McClain about Montgomery's review, Bates was "sounding an alarm that somebody here is lying on me," but McClain was "nonchalant" and did not "drop what she was doing to attend to it" or offer to investigate. (Bates Dep. 86.) Montgomery left the office, but, after Montgomery left, Bates was "crying to Sheila [McClain] like, I don't know why Gail is doing this to me." (*Id.* at 87.) Because Bates was so upset, McClain suggested she take the rest of the day off. (*Id.* at 87–88.)

When the plaintiff returned to work on February 13, 2023, instead of working in the "Split Cases" department where she had previously been posted, she was assigned to the "Full Cases" department. (*Id.* at 104.) The plaintiff did not object.[4] (*See id.* ("[Montgomery] said, Ru, you go to full cases today. I said, Okay. I get my RF, and I go to full cases." (*Id.*)[5]

The plaintiff testified that she drafted a resignation letter on February 19, 2023, because the full case position was hurting her back. (Bates Dep. 110; *see also* Doc. No. 32-6.) The plaintiff's letter generally complained that she had not been treated "fairly" by Montgomery. (Doc. No. 32-6.) Bates concluded the letter by thanking McClain for "every opportunity & listening ear [she] gave" and for trying to resolve the plaintiff's issues with Montgomery. (*Id.*) Bates claims she gave the letter to McClain on February 20, but McClain talked her out of resigning. (Bates Dep. 115.) McClain did not recall receiving a resignation letter from Bates. (McClain Dep. 91.)

On March 20, 2023, the plaintiff "chose" not to go to the regular mid-shift meeting because she found the meetings a waste of time. (Bates Dep. 169–70.) Bates claims that, after that meeting, another employee, "Nigel," told her that Montgomery was "talking bad" about her during the meeting and had called her a "slave." (*Id.* at 171.)

Bates immediately went to McClain's office to report what she had been told. According to the plaintiff, she informed McClain that she had "got[ten] word" that Montgomery was "calling [her] names"—more specifically, that Montgomery had called Bates a "slave." (*Id.*) McClain called Montgomery into her office to confront her with this allegation. When Montgomery arrived,

---

[4] According to Montgomery, the plaintiff was moved to full case because she told Montgomery that "she didn't like split lot, and she wanted to work in another department." (Doc. No. 32-7 at 23–24.)

[5] The plaintiff explained that an RF gun is a scanning device used for counting and locating inventory. (Bates Dep. 61.) It can "measure productivity" and apparently could also be used for communication. (*Id.* at 62, 313–14 (referring to "get[ting] messages on these RF guns" from Montgomery).)

McClain told her that Bates had heard that Montgomery was "calling her names." (*Id.* at 172.) Bates immediately objected and told McClain, "No, say what I told you. I said . . . Gail called me a slave." (*Id.*) The plaintiff was "very much upset" and "talking loud." (*Id.*)

According to Bates, Montgomery denied this allegation, saying she "would never" say something like that,[6] but Bates interrupted her to say, "Yes, you would, Gail. I said, Because I've heard you talk bad about other women of different nationalities." (*Id.* at 173.) Specifically, the plaintiff claimed she had heard Montgomery speak derogatorily about another employee who did not "speak really good English," saying "I don't even know why [McClain] hired her." (*Id.*)

The plaintiff claims that, at this juncture, McClain interjected, saying, "Let me stop you right there. I'm going to terminate you right now. This just isn't going to work." (*Id.* at 174.) When the plaintiff asked her what she meant, McClain replied that they had "had a report that you pushed some pallets on the floor," that she was a "no call, no show on Friday," and a third thing that the plaintiff could not recall. (*Id.*; *see id.* ("It was three things she said she was firing me for. Because I . . . allegedly violated company policy.").) Montgomery left the meeting at that point, "like she always [did]," but McClain took Bates' badge, walked her to her locker, and instructed her not to return to Leviton property. (*Id.*)

Leviton's version of this event is markedly different. According to Montgomery, an employee named Billy Hardaway had come to her and reported that Bates had "pushed [some pallets] out" into the aisle. (Montgomery Dep. 30.) He had not actually seen her push the pallets, but he reported that "she was in the lane, and they went out, and he saw her in the lane." (*Id.*) According to Montgomery, she confirmed by reviewing the security video that Bates had pushed

---

[6] Montgomery also denied making the "slave remark" under oath at her deposition. (Montgomery Dep. 41.)

the pallets. (*Id.*) Montgomery reported that incident and several others to McClain. (*Id.* at 27.) Montgomery and McClain met with Bates on March 20, 2023 to "discuss [Bates'] productivity," the "fact that she pushed the pallets out," and the time she had left her shift early without notifying Montgomery, but the meeting "kind of got out of hand." (*Id.* at 29.) Montgomery testified that Bates "got loud" and was "overspeaking" McClain, denying that she had made those mistakes and accusing them of picking on her and blaming her for something someone else had done. (*Id.*) McClain tried to explain "how [they] knew it was her," presumably referencing either Hardaway's report or the video of Bates pushing over the pallets,[7] but Bates "wouldn't have anything to do with it." (*Id.* at 29–30.) Finally, McClain interjected to say that they were not "getting anywhere with this." (*Id.* at 31.) Montgomery recalled that Bates took off her badge, laid it on McClain's desk, and walked out. (*Id.*) She "cleaned out her locker and left." (*Id.*) Montgomery understood that the plaintiff had quit.

McClain's account was similar. She testified that she was made aware that the plaintiff had been out on medical leave but had failed to return to work on the day she was scheduled, so she asked Montgomery to send her in for "attendance counseling." (McClain Dep. 52.) This would have been a "verbal counseling," which is the first step in Leviton's "process." (*Id.*) Bates and Montgomery both came into McClain's office, and "the conversation really escalated." (*Id.*) Bates became "very, very angry," and McClain recalled that, at some point, McClain said, "We're not getting anywhere with this. We cannot continue." (*Id.* at 53.) Bates then "dropped her badge on [McClain's] desk and left." (*Id.*) According to both McClain and Montgomery, no one told Bates that she was fired or could not work at Leviton anymore. (*Id.*; *see also* Montgomery Dep. 31.)

---

[7] This alleged video is not in the record, and it was apparently not produced in discovery. (*See* Montgomery Dep. 31.)

Although McClain maintains that no one told Bates she was terminated during that meeting, she also characterized Bates' termination as a "mutual decision." (*Id.* at 54.) She explained that the "decision had been made to terminate her employment, but the words were never spoken." (McClain Dep. 57.) She further testified that, when they met with Bates in her office on March 20, "it was pretty obvious to us that [Bates] was fed up with us" "when she put the badge down and walked away." (*Id.* at 59, 60.) McClain continued: "So that I called a mutual decision. I did not have to look at her and say 'you're fired' or 'I'm terminating you.' . . . [But] under the law, . . . [w]e terminated her because she was no longer an employee of Leviton." (*Id.* at 60.) She clarified that, in her personal opinion, the termination was "mutual" ("It's the way I felt."), but as Leviton's corporate representative, she agreed that Bates was terminated. (*Id.* at 60.) Bates was officially terminated when she did not return to work on March 21. (*Id.* at 108.) McClain expressly agreed with the statement in the company's EEOC position that Bates was fired for "productivity, safety, attendance, and punctuality." (*Id.* at 56, 59; *see also* Doc. No. 35-10 at 2.) The EEOC statement further stated that Bates was fired "[w]hen she was a no-call, no-show for work on March 21, 2023" and that the combination of "subpar performance, attendance and punctuality, combined with the verbal abuse she displayed" at the meeting on March 20, "left Leviton no choice but to end her employment." (Doc. No. 35-10 at 3.) In a Declaration filed in support of the summary judgment motion, McClain further attests that an employee who abandons her job is terminated by Leviton. (Doc. No. 34-1, McClain Decl. ¶ 8.)

According to McClain, Bates did not report to her that she had heard that Montgomery had referred to Bates as a slave. (*Id.* at 65.) McClain did not learn about that allegation until the company "received legal documents," apparently meaning the plaintiff's EEOC charge. (*Id.*; *see also* Doc. No. 35-10 at 1, 2, 19.)

After the plaintiff's employment terminated, Leviton did not replace her; instead, "her duties were distributed among the remaining employees." (McClain Decl. ¶¶ 6–7.)

## III.    PROCEDURAL HISTORY

The plaintiff filed this lawsuit in December 2024, after exhausting her administrative remedies. As set forth above, she asserts claims of race discrimination, racial harassment/hostile work environment, and retaliation in violation of Title VII and § 1981. Defendant Leviton moves for summary judgment on all of these claims. (Doc. No. 30.) In support of its motion, it filed a Statement of Undisputed Material Facts ("SUMF"), Memorandum of Law, and the documentary evidence cited therein. (Doc. Nos. 31, 32, 32-1 through 32-9.) The plaintiff opposes summary judgment, arguing that material factual disputes preclude summary judgment on any of her claims. (Doc. No. 35.) She filed a Response to the defendant's SUMF as well as her own Additional Statement of Facts ("ASF"). (Doc. Nos. 35-1, 35-2.) The defendant filed a Reply in further support of its claims and a Response to the ASF.[8]

## IV.    DISCUSSION

The parties agree that claims for race discrimination under Title VII and § 1981 are "generally analyzed under the same framework." (Doc. No. 35 at 5 (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018)); *see also* Doc. No. 32 at 6 (citing *Greer v.*

---

[8] Prior to May 2025, the court's Local Rules authorized a party responding to a summary judgment motion to include with its response to the movant's statement of *undisputed* material facts a "concise statement of additional facts" that the non-movant believes are both material and *disputed*. L.R. 56.01(c) (Jan. 24, 2020). As amended in May 2025, the Local Rules no longer authorize such an additional statement of disputed facts, *see* L.R. 56.01(e) (May 15, 2025), and they never authorized an additional statement of *undisputed* facts. The defendant, however, did not object to the plaintiff's ASF. The court has included in its recitation of the facts those facts in the plaintiff's ASF that appear to be both material to the defendant's motion and disputed but has omitted reference to those that are clearly irrelevant.

*Cummins, Inc.*, No. 22-5663, 2023 WL 9472037, at \*3 (6th Cir. Oct. 23, 2023)).) The court, therefore, does not address the § 1981 claims as distinct from the Title VII claims.

### A.    Discrimination

#### 1.    The Legal Framework

A plaintiff may prove a claim of race discrimination in employment, in violation of Title VII and § 1981, using direct evidence or "circumstantial evidence that creates an inference of discrimination." *Greer*, 2023 WL 9472037, at \*3 (citing *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018)). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Peeples*, 891 F.3d at 633 (6th Cir. 2018) (alteration in original) (citation omitted).

For claims that rely on indirect, or circumstantial, evidence, courts apply the familiar three-part "*McDonell Douglas*" framework, first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-03 (1973). Under this framework, the plaintiff in a Title VII action carries the initial burden of establishing a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified for the position in question, and (4) she was replaced by a non-protected person or was treated differently from a similarly situated, non-protected employee. *Greer*, 2023 WL 9472037, at \*3; *Peeples*, 891 F.3d at 634.

If, and only if, the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action taken against the employee. *McDonnell Douglas*, 411 U.S. at 802. "The defendant's burden is . . . one of production; not persuasion." *Montgomery v. Honda of Am. Mfg., Inc.*, 47 F. App'x 342, 347 (6th Cir. 2002)

(citation omitted). "Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, 'the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011)).

### 2. The Parties' Arguments

Leviton argues that (1) the plaintiff's discrimination claim fails because the plaintiff cannot establish either that similarly situated white employees were treated more favorably than she was or that she was replaced by an employee outside her protected class; and (2) it terminated the plaintiff for legitimate, non-discriminatory reasons, and the plaintiff cannot show that the reasons were pretext for discrimination. (Doc. No. 32 at 7–9.)

The plaintiff argues in response that the *prima facie* inquiry is flexible and that the fourth element may also be satisfied by presenting some other evidence of discrimination. (Doc. No. 35 at 7.) The only other evidence to which she points, however, is her February 19 resignation letter (in which she claimed she was treated "unfairly" but did not attribute such unfairness to race) and her report to McClain on March 20, 2023 that she had been told that Montgomery had referred to her as a "slave." (*Id.* at 7–8.) Otherwise, her Response confusingly combines the elements and proof required for her discrimination claim with the elements and proof of her hostile work environment and retaliation claims, which the court addresses below. She also argues that material factual disputes preclude summary judgment on the question of pretext.

The defendant responds that, even if the *prima facie* inquiry were as flexible as the plaintiff claims, she has no other evidence of discrimination and that her claim that Montgomery referred to her as a "slave" is premised on inadmissible hearsay and is not sufficient to establish proof of racist animus on the part of Montgomery or Leviton.

### 3.    *Analysis*

Viewing the facts in the light most favorable to the plaintiff, the court finds that the plaintiff has not made out a *prima facie* case of race discrimination. Although Bates' allegation may be admissible in other contexts (discussed below), the only evidence she can present to show that Montgomery called her a slave is in the form of inadmissible hearsay that cannot be considered in the context of considering whether Bates has made out a *prima facie* case of discrimination based on her termination.

Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally not admissible in evidence, Fed. R. Evid. 802.[9] The declarant in this case is "Nigel," who made an out-of-court statement that he heard Montgomery refer to the plaintiff as a "slave." The plaintiff apparently seeks to offer this statement for the truth of the matter asserted: that Nigel, in fact, heard Montgomery make that comment. But Nigel has not testified to that effect, and his statement in its entirety is inadmissible hearsay.

Aside from her reference to what Nigel allegedly told her, the plaintiff has offered no evidence to rebut Leviton's assertion that it did not replace her after she was terminated, and she has offered no evidence whatsoever to suggest that any similarly situated employee outside her protected class was treated more favorably than she was. The evidence Bates offers suggests only that she did not get along with Montgomery and perceived Montgomery to be picking on her

---

[9] The hearsay rules are not strictly observed at the summary judgment stage, but the plaintiff also has not shown that Nigel's statement could be "presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), for instance, by producing with her briefing an affidavit or declaration from Nigel.

unfairly. But Montgomery did not terminate her, and Bates offers no admissible evidence from which a reasonable jury could conclude that her termination had anything to do with her race. That is, the plaintiff has not presented proof sufficient to establish the fourth element of her *prima facie* case.

The defendant is entitled to summary judgment on the plaintiff's race discrimination claim premised upon her termination.

## B. Race Harassment/Hostile Work Environment

### 1. The Legal Framework

To establish a *prima facie* hostile-work-environment claim under Title VII, a plaintiff must show that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [membership in a protected group], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Leath v. Collins*, No. 25-1408, 2026 WL 228827, at *4 (6th Cir. Jan. 28, 2026) (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013)).

"Harassment is 'based on' a protected category when 'it would not have occurred but for the plaintiff's' belonging to a protected group." *Id.* at *5 (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)). "A plaintiff can rely on direct or comparative evidence to show that she experienced harassment based on a protected characteristic." *Id.* (citations omitted). "Direct evidence of racial animus includes 'the use of race-specific and derogatory terms.' Comparative evidence encompasses 'how the alleged harasser treated members of both races in a mixed-race workplace.'" *Id.* (quoting *Williams*, 643 F.3d at 511).

The conduct in question must be "severe or pervasive." Generally, conduct that is "merely offensive" will not suffice to support a hostile work environment action. *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993). Rather, "[t]he harassment [must have] affected the employee by creating an objectively intimidating, hostile, or offensive work environment." *Kellar v. Yunion*, Inc., 157 F.4th 855, 872 (6th Cir. 2025) (alterations in original) (internal quotation marks omitted) (quoting *McNeal v. City of Blue Ash*, 117 F.4th 887, 898 (6th Cir. 2024)). The plaintiff must present proof of "a work environment that 'would reasonably be perceived . . . .as hostile or abusive.'" *Id.* (quoting *McNeal*, 117 F.4th at 904). In making this assessment, the court must "consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *McNeal*, 117 F.4th at 904). It has long been established that "'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* at 873 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

### 2. *The Parties' Arguments*

The defendant argues that the plaintiff's hostile work environment claim fails because it relies entirely on inadmissible hearsay (the plaintiff's claim that "Nigel" told her Montgomery called her a "slave"), because she has no other evidence of any type of harassment based on race, and because, even if that single alleged comment is taken into consideration, the purported harassment was not sufficiently severe or pervasive to alter the terms and conditions of her employment. (Doc. No. 32 at 9–14; Doc. No. 36 at 3–5.)

The plaintiff responds that a reasonable jury could find that the plaintiff was subjected to actionable harassment. (Doc. No. 35 at 13.) Specifically, she argues that harassment needs only to be severe *or* pervasive, not both, and that the single incident at issue could be deemed sufficiently "severe" to qualify as harassment that altered the terms and conditions of her employment. She

also argues that this comment did not "occur in a vacuum." (*Id.*) She points to her February 19 resignation letter in which she described Montgomery's "lies and biased judgment" and being "set up for failure." (*Id.* (quoting Doc. No. 32-6).) She contends that "a jury could find actionable harassment based on the alleged 'slave' comment, the surrounding treatment, the failure to investigate, and the immediate termination after Bates complained." (*Id.* at 14.)

### 3. Analysis

Courts, indeed, recognize that a single instance of "extremely serious" harassment may be sufficient to create a hostile work environment. *Ault v. Oberlin Coll.*, 620 F. App'x 395, 402 (6th Cir. 2015) (quoting *Hickman v. Laskodi*, 45 F. App'x 451, 456 (6th Cir. 2002)). Such conduct, however, typically involves threats of bodily harm, *see, e.g.*, *Hickman*, 45 F. App'x at 454–55 (denying motion to dismiss), or extremely offensive touching, *see, e.g.*, *Ault*, 620 F. App'x at 403 (finding a jury question as to whether the defendant's physical assault of the plaintiff was "sufficiently severe by itself" to create a hostile work environment where the defendant supervisor shoved the plaintiff against shelves in a walk-in cooler, rubbed his genitals against her, and held her in place despite demands that he stop); *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012) (recognizing that "extreme incidents such as rape or sexual assault" may create a hostile work environment).

On the other hand, it is well established that "'mere offensive utterance[s],' as opposed to physically threatening or humiliating conduct" are "not enough to create a hostile working environment within the meaning of *Harris*." *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996); *accord Williams*, 643 F.3d at 512–13 ("Occasional offensive utterances do not rise to the level required to create a hostile work environment. 'To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected.'" (quoting *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)). In *Williams*, for example, a supervisor allegedly

"call[ed] Jesse Jackson and Al Sharpton 'monkeys' and sa[id] that black people should 'go back to where [they] came from,'" but the court found this comment, along with a few other isolated comments, insufficient to create a hostile work environment. *Williams*, 643 F.3d at 513.

For purposes of ruling on the defendant's summary judgment motion, the court accepts as true that another employee told Bates that Montgomery had called her a slave (even though the court does not accept the truth of *what* the other employee told Bates). And the plaintiff's hearing this statement could reasonably upset her. However, this single incident of what amounts to a rumor is not sufficient, standing alone, to create a hostile work environment. Even if the court considers the "slave" allegation in the context of the plaintiff's other allegations, none of her other allegations of workplace tribulations relates to race, and she simply has not presented evidence that her workplace was, objectively, permeated with severe or pervasive harassment based on race. At most, her allegations reflect "'[m]ere disrespect or antipathy' indicative of interpersonal conflict rather than identity-based hostility." *Leath*, 2026 WL 228827, at *6 (quoting *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021)); *see also Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (reversing judgment for the plaintiff where the comments about which the plaintiff complained, though arguably disrespectful and offensive, were not related to the plaintiff's origin or ethnicity "as required for him to prove a hostile work environment," emphasizing that Title VII does "not prohibit all verbal or physical harassment in the work place; it is directed only at 'discriminat[ion] . . . because of' protected characteristics under the statutes" (citations omitted)).

The defendant is entitled to summary judgment on the plaintiff's hostile work environment claim.

### C.       Retaliation

#### 1.       *The Plaintiff's Prima Facie Case*

The *McDonnell Douglas* framework also applies to retaliation claims under Title VII. To establish a *prima facie* case of retaliation, the plaintiff must present evidence that (1) she engaged in protected activity, (2) Leviton knew about her activity, (3) she suffered an adverse action, and (4) the adverse action was causally connected to her protected activity. *Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1032–33 (6th Cir. 2025).

The defendant argues that the plaintiff cannot establish a *prima facie* case of retaliation because she cannot show either that she engaged in protected activity or that her termination was causally connected to any such protected activity. In making these arguments, however, Leviton does not engage with the facts as alleged by the plaintiff. Although Montgomery and McClain deny learning about the plaintiff's allegations about the "slave" comment until after her termination, the court must accept as true that she went to McClain's office specifically to complain that Montgomery had called her a "slave." "Reporting or protesting discriminatory practices in the workplace counts as 'protected activity' under Title VII." *Patterson v. Kent State Univ.*, 155 F.4th 635, 647 (6th Cir. 2025) (citation omitted). The plaintiff's report was at least arguably protected activity, and McClain, as HR Manager, knew about it, at least according to the plaintiff.

Bates also disputes the defendant's version of her termination. According to Leviton, the plaintiff put down her badge and walked out during her meeting with McClain and Montgomery and failed to return the next day. According to Bates, McClain told her she was terminated within minutes of her report of Montgomery's alleged comment. For purposes of summary judgment, the court accepts the plaintiff's version of events, and the plaintiff's termination "unquestionably qualifies as an adverse action." *Id.* at 1033.

Finally, while "[t]emporal proximity alone generally is not sufficient to establish causation," *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020), "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation," *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (confirming that temporal proximity alone may establish causation where the adverse employment action is "taken just days or weeks from when the employer learns of the employee's protected activity"). The extremely close proximity in this case—mere minutes—meets that standard. The plaintiff has presented sufficient proof to establish a *prima facie* case of retaliation.

### 2. The Defendant's Proffered Explanation and the Plaintiff's Evidence of Pretext

As set forth above, once the defendant proffers a nondiscriminatory reason for the adverse employment action, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Jackson*, 814 F.3d at 779. "Notably, this burden on the plaintiff 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, on summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Id.* (quoting *Provenzano*, 663 F.3d at 812). Generally, however, to establish pretext, the plaintiff must come forward with some evidence from which a reasonable jury could conclude that the defendant's proffered reason had "no basis in fact, did not motivate the adverse employment

action, or was insufficient to motivate the action." *Greer*, 2023 WL 9472037, at \*3 (citing *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). "An employer's changing rationale for making an adverse employment decision can be evidence of pretext," *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), because "[s]hifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

The plaintiff argues that the defendant's shifting explanations for her termination are sufficient to establish pretext. In particular, she points out that Montgomery and McClain testified that no one told Bates she was fired, that McClain testified that the termination decision was "mutual," and that Leviton told the EEOC that Bates was fired "for productivity, safety, attendance, and punctuality." (Doc. No. 35 at 18.) She asserts that "[t]hese inconsistent explanations permit a jury to find pretext." (*Id.* (citations omitted).)

Leviton's Reply does not address that argument. Instead, the defendant continues to argue that "[i]t is undisputed that the parties engaged in a heated conversation that was not moving toward resolution, at which time Plaintiff turned her badge in and did not return to work," and that her walking out on March 20 and not returning on March 21 was the "but for" cause of the plaintiff's termination." (Doc. No. 36 at 6.) It is unclear why the defendant continues to insist that its version of events is undisputed when it is unambiguously disputed by the plaintiff, who claims that she was fired, escorted to her locker to gather her things, and told not to return to Leviton. (Bates Dep. 174.) The court cannot make credibility determinations and must accept, for purposes of the defendant's motion, that McClain told the plaintiff that she was fired almost immediately after Bates complained that Montgomery had called her a slave. Because the defendant fails to

meaningfully contest the plaintiff's argument concerning pretext, it has not shown that it is entitled to summary judgment on the retaliation claim.

## V. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 30) will be granted in part and denied in part. Specifically, the defendant is entitled to summary judgment on the plaintiff's claims of race discrimination and hostile work environment, but it has not established that it is entitled to judgment as a matter of law on the plaintiff's retaliation claim. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge